IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROY PAUL BROWN,

      Plaintiff,

v.

NANCY BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

OPINION AND ORDER

17-cv-0438-slc

  Plaintiff Roy Paul Brown filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

OPINION

  Plaintiff Roy Brown is 49 years old and was a high school math teacher for 20 years. In 2011, he began having symptoms of what was later determined to be pudendal neuralgia, a thought-to-be rare condition that occurs when the pudendal nerve—which runs from the buttocks to the genitals and perineum area—becomes damaged or irritated. *See* https://www.webmd.com/pain-management/pudendal-neuralgia#2 (last visited June 19, 2018). This condition's main symptom is pelvic pain, which may be burning or shooting and is typically worse when sitting down and better when standing or lying down. Other symptoms include heightened sensitivity, numbness or "pins and needles" in the pelvic area, feeling as though

there's swelling or an object in the perineum, urinary urgency, pain during sex and for men, erectile dysfunction. *See* https://www.nhs.uk/conditions/pudendal-neuralgia/ (last visited June 19, 2018). Possible causes of the condition include compression of the pudendal nerve, prolonged sitting or cycling, or previous surgery, but it can occur even without a specific cause. *Id*.

Although it is unclear what caused Brown's pudendal neuralgia, nearly every medical professional who has seen or evaluated Brown—and there have been many—agrees that he has the condition and that it causes pain. Indeed, one look at Brown's treatment record removes any doubt that Brown's condition is painful: he has attempted to relieve his pain with multiple nerve blocks, hundreds of hours of physical therapy, chiropractic care, laser treatments, dry needling, internal rectal massages and even invasive nerve decompression surgery. In addition, he takes low-dose opioids and other medications used to treat nerve pain. According to Brown, however, none of these procedures and therapies have adequately alleviated his pain. The only thing that Brown has found to relieve his pain is to lie in a reclined position, which he says he does for all but a total of three to four hours a day.

The professionals who have examined Brown and provided opinions concerning his ability to work were unanimous that he would require substantial amounts of time lying down throughout the workday. Not one of them has suggested that Brown is exaggerating his symptoms. Indeed, one of the more skeptical physicians, Cassandra Schamber, M.D.[1], said that although Brown's level of dysfunction was "unusually severe" for someone with his condition

---

[1] Dr. Schamber performed an IME of Brown on August 5, 2014, presumably in connection with his application for long-term disability benefits from his employer.

and suggestive of Somatic Symptom Disorder[2], AR 1105, she saw no evidence of malingering, noting that "the mere fact that the patient has been willing to suffer through all the [nerve blocks and decompression surgery] is proof of that." *Id*. Although Schamber thought the amount of time Brown spent in a supine position was excessive, she nonetheless recommended that he "be able to change positions every 15 minutes between standing, sitting, and lying down with a maximum of 30 minutes sitting per hour." *Id*. Brown's treating physician (Dr. Pierpont) and a consulting physician (Dr. Quenemoen) who examined Brown twice thought Brown was even more restricted in his ability to sit or stand in a given day, as were two physical therapists (Richard Eilert and Vincent Kabbatz) who administered tests to Brown that measured his functional capacity.

Nevertheless, the ALJ who adjudicated Brown's application for DIB found that Brown can perform light work (which is defined as lifting or carrying up to 20 pounds occasionally and 10 pounds frequently, and either standing or walking a good deal or sitting most of the time with some pushing or pulling of leg controls), provided that he had the ability to change from a seated to a standing position at will. (The ALJ also found that Brown had some mild mental limitations, but Brown raises no challenge to those findings.) In adopting this residual functional capacity, the ALJ placed "great weight" on the opinion of Dr. Andrew Steiner, a physical medicine and rehabilitation specialist who testified at the administrative hearing. Dr. Steiner testified that, after reviewing Brown's entire medical file, he could find few objective

---

[2]A psychological condition in which a person has excessive thoughts, feelings and behaviors relating to his physical symptoms, which may or may not be associated with a diagnosed medical condition. *See* https://www.psychiatry.org/patients-families/somatic-symptom-disorder/what-is-somatic-symptom-disorder (last visited April 23, 2018). Brown has been evaluated by a number of mental health professionals and has not been diagnosed with Somatic Symptom Disorder.

3

clinical findings to explain the severity of the symptoms Brown was reporting. In Steiner's view, the objective findings of record supported at most a restriction to light work with the ability to change position from seated to standing at will. Insofar as Brown's treating doctors had found more severe restrictions, Steiner said, those opinions "were based on limitations because of pain reports and not because of objective findings." AR 88. Steiner, however, expressed no opinion whether Brown's treating physicians were reasonable in crediting his complaints of pain. AR 89.

As a starting point, the agency has expressed a preference for the opinions of medical professionals who have treated–or at least examined–the claimant over those who have done neither, *see* 20 C.F.R. 404.1527. Nonetheless, the ALJ gave "great weight" to Dr. Steiner's opinion, agreeing that the opinions of Brown's treating and evaluating sources were flawed because their opinions were based largely on Brown's own reporting of his symptoms rather than on "objective findings." The ALJ did not think Brown's reports concerning the intensity, persistence and limiting effects of his symptoms were reliable because they were "not entirely consistent with the medical evidence and other evidence in the record." AR 26.

Brown challenges both the ALJ's weighing of the medical opinions and his assessment of Brown's subjective complaints. In this case, these are two sides of the same coin.

An ALJ is permitted to be skeptical of medical opinions that are based solely upon the claimant's subjective complaints rather than objective medical evidence. *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016); *Parker v. Astrue*, 597 F.3d 920, 922-23 (7th Cir. 2010); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). Although Brown does his best to argue otherwise, the record supports the ALJ's finding that Dr. Pierpont, Dr. Quenemoen and the other physicians who opined that Brown was

4

unable to work were relying largely on Brown's subjective description of his pain and other symptoms in reaching that conclusion. For example, Dr. Quenemoen did not note any abnormal findings during his examination of Brown other than some tenderness and deconditioning, and his report leaves the impression that he was merely reciting Brown's subjective complaints when he opined that Brown was "unable to sit or stand or walk for any length of time." Likewise, Dr. Pierpont does not cite any objective evidence for his similar conclusion, and Dr. Collins seems to have been merely parroting Brown's own statements when she said that his pain syndrome "is that if he does get flared it can take a couple of days for him to recover."

At the same time, however, it is well-settled that an ALJ cannot reject a claimant's statements about pain solely because there is no objective medical evidence to confirm it. *Parker*, 597 F.3d at 923 ("It would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain'"); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (an ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it."); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (same); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain."). This is reflected in the agency's rules, which describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the

individual's symptoms, such as pain." SSR 16-3p, at *2 (superseding SSR 96-7p)[3]; see also 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . .." SSR 16-3p, at *2.

In requiring its ALJs to perform this second step, the agency recognizes that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence." *Id*. *Accord Johnson*, 449 F.3d at 806 ("The etiology of pain is not so well understood, or people's pain thresholds so uniform, that the severity of pain experienced by a given individual can be 'read off' from a medical report."). Thus, SSR 16-3p, like former SSR 96-7p, requires the ALJ faced with a discrepancy between the objective evidence and the claimant's subjective complaints to consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, at *4.

---

[3] With the recent issuance of SSR 16-3p, the Social Security administration has indicated that it would no longer assess the "credibility" of a claimant's statements, but instead will focus on determining the "intensity and persistence of symptoms." Social Security Regulation (SSR) 16-3p, at *2. Reflecting on this change in wording, the Court of Appeals for the Seventh Circuit has opined that it "is meant to clarify that administrative law judges are not in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Thus, this court will continue to apply pre-SSR 16-3p circuit case law in reviewing an ALJ's evaluation of a claimant's subjective complaints.

In Brown's case, the ALJ found that Brown has pudendal neuropathy with chronic pelvic pain syndrome and that this impairment could reasonably be expected to produce his pain or other symptoms. AR 26. These findings obliged the ALJ to proceed to the second step of the analysis and consider the entire record to resolve the discrepancy between the objective evidence and Brown's self-reports. In reviewing the ALJ's decision on this point, the court looks to see whether the ALJ's credibility determination is "reasoned and supported," as it may be overturned only if it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). A credibility determination is patently wrong if it is illogical or "lacks any explanation or support." *Id*.

The ALJ's credibility determination in this case suffers from a number of logical flaws. First, the ALJ found that "[n]one of the claimant's treating providers have *recommended* the claimant spend as much time supine as he reports he does in a typical day," AR 33 (emphasis in original), and he cited this as reason to omit such a limitation from the RFC. However, Brown never claimed that he lied down as much as he did because his doctors said he should, but rather because it was the only position in which he was pain-free. As Brown points out, among the things an ALJ is to consider when assessing the severity of a claimant's symptoms is "[a]ny measures *other than treatment* an individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)." SSR 16-3p, ¶ 2(d) (emphasis added). The ruling does not suggest that an ALJ may credit only those pain-relief measures that are prescribed by a treating physician.

What's more, some medical professionals *did* recommend that Brown spend a significant amount of time lying down. In particular, Dr. Schamber, a pain specialist who "treated many

7

male and female patients" with pelvic pain like Brown's, stated: "I'd *recommend* that he be able to change positions every 15 minutes between standing, sitting, *and lying down* with a maximum of 30 minutes sitting per hour." AR 1105 (emphasis added). The ALJ rejected this recommendation, however, explaining that it was based on plaintiff's "self-report." AR 33. At the same time, the ALJ accepted Dr. Schamber's opinion that there was a discrepancy between Brown's reported limitations and the objective medical evidence. By accepting only that part of Schamber's report that tended to hurt Brown's claim without also accepting her favorable conclusion about his limitations, the ALJ engaged in the sort of analytical "cherry-picking" that the Seventh Circuit has "repeatedly forbidden." *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

In addition to Dr. Schamber, two physical therapists—who were asked specifically to arrive at a set of work limitations for Brown—concluded that he would need substantial periods of time lying down. *See* AR 809-11, Functional Capacity Evaluation by Richard Eilert, PT; AR 998, Functional Capacity Evaluation by Vincent Kabbatz, MMPT, FAAOMPT, COMT. Eilert conducted a three-hour standardized functional capacity evaluation of Brown on November 21, 2013, after which he concluded that Brown had "[s]ignificant limitation of static posture tolerances" and that he would likely require frequent posture changes and periodic lying down if he was to was to attempt to return to his teaching job. AR 811. Kabbatz, a physical therapist with special training in neuro-muscular skeletal disorders, performed a two-hour Functional Capacities Evaluation of Brown on January 6, 2016. AR 998. Kabbatz found that Brown should have the following work restrictions because of pelvic pain: lifting no more than 10 pounds; no squatting or kneeling; rare crawling, forward bending, overhead reaching,

8

push/pulling and climbing; occasional standing and walking, with a break every 30 minutes; occasional sitting for a total of 1.5 hours with breaks every 30 minutes; and frequent forward reaching.

The ALJ rejected these evaluations as inaccurate measures of Brown's work abilities, noting that Brown had limited himself during the testing. Although the ALJ was correct in noting that Brown did not complete all the tests, this fact alone does not adequately support the ALJ's decision to wholly disregard the FCEs. As Brown points out, Eilert specifically noted the areas in which Brown was self-limiting—stand-up lift, walking, and ladder climb—and indicated that Brown had "worked to maximum abilities" on the other test items. Kabbatz found that Brown "demonstrated good effort" and passed 100% of the validity criteria. Presumably, physical therapists who administer such tests are trained to look for malingering and symptom exaggeration, and to indicate whether any test results are tainted by it; neither Eilert nor Kabbatz reached such a conclusion with respect to Brown except in a few irrelevant areas. The ALJ's conclusion that Brown's self-limiting behavior on some tests was reason to dismiss the FCEs entirely reflects his own lay opinion and is not supported by substantial evidence. *See* SSR 06-03p (noting that although physical therapists are not "acceptable medical sources" qualified to establish the existence of medically determinable impairment or to provide medical opinion, their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").

The remaining reasons cited by the ALJ for finding Brown's subjective complaints (and by extension, any medical opinions that accepted those complaints) not worthy of belief are equally unsound. The ALJ found that Brown was able to perform activities that were "fully

9

consistent with the ability to perform work within the RFC," citing progress notes in which Brown was noted to have engaged in a variety of activities including loading his wood stove, putting on snow tires, tinkering in his workshop, riding his snowmobile a few times for 5-10 minutes a time, attending church and school activities and going on a week-long vacation with his family in an RV. AR 31. Clearly, however, Brown does not do these things all day, every day. At the administrative hearing, Brown testified that he is able to be active for a half hour to an hour at a time before his pain increases to the point that he needs to go lie down. AR 73. Brown rides in a car with his seat almost fully reclined. When Brown goes on vacation with his family, he lies on the couch or in a zero gravity chair between activities. None of his reported activities are inconsistent with this testimony.

The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate to an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("the critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer."); *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016) (finding that the ALJ improperly based his adverse credibility determination on, among other things, the claimant's ability to care for herself and her grandchildren). The ALJ did not explain why he concluded that the life activities Brown reported were inconsistent with his reported need to lie down so often for so long.

The ALJ also seemed to discount Brown's subjective complaints on the ground that Brown's "conservative course of care during the relevant time period has been at least somewhat effective in improving his pain complaints." AR 30. This reasoning falls short. This observation contains so many qualifiers that it fails to answer the question whether Brown is so improved that he can perform light work with a sit/stand option. More problematic is the ALJ's characterization of Brown's course of care as "conservative." This marginalizes Brown's unsuccessful attempts to relieve his pain with painful nerve block injections in his pudendal nerves and with invasive nerve decompression surgery.

Moreover, the ALJ does not suggest that there is anything else that Brown can try. (According to Brown's testimony, which is supported by Dr. Collins' report, the only thing he has not tried is pulsed radiofrequency treatment, which is performed by a doctor on the East Coast. AR 83.) Indeed, a review of Brown's treatment history, which documents five years of consistent pain complaints and continuous efforts to relieve that pain, tends to refute the ALJ's adverse finding regarding the severity of Brown's pain. *Accord Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) ("What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits."); *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998)(questioning "whether a claimant with seven years of medical records detailing repeated complaints of severe pain, who undergoes three back surgeries in the hopes of alleviating that pain and who now lives with a

morphine pump implanted in her body, can be found not credible regarding her complaints of pain.").

Brown's course of treatment is not the only evidence the ALJ ignored. He also failed to mention Brown's consistent work history, which, although not dispositive, "weighs in favor of a positive credibility finding[.]" *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). The ALJ also seemed to overlook the fact that the opinions from Brown's medical sources concerning his ability to work were largely consistent with one another. *See* 20 C.F.R. § 404.1527(c)(4) (more consistent medical opinion is with record as a whole, more weight will be given to that opinion). Although not dispositive, the consistency of the medical opinions is a factor that tends to support Brown's claim.

In sum, the ALJ's evaluation of the medical and other evidence in the record contains enough omissions and logical flaws to preclude this court from upholding his decision. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (deference to ALJ's decision is lessened where ALJ fails to build "accurate and logical bridge" between evidence and conclusion). Indeed, it is both possible and reasonable to infer from this record that Brown is disabled. However, Brown has not asked for a remand with instructions to award benefits, and even if he had, I am not convinced that the record evidence is such that a reasonable person could reach no conclusion other than finding Brown is disabled. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (award of benefits appropriate only if all factual issues involved in entitlement determination have been resolved and resulting record supports only one conclusion) (citation omitted). The record does contain infirmities, namely, the disconnect between the objective medical evidence and the reported severity of Brown's pain. But as emphasized in this opinion, that disconnect alone is

not a sufficient basis on which to decline benefits; there must be other, sound reasons for finding that Brown is exaggerating his pain. The reasons the ALJ provided in this case were unsound. Accordingly, this case must be returned to the agency for further proceedings consistent with this opinion.

ORDER

IT IS ORDERED THAT the decision of the Commissioner of Social Security denying Roy Brown's application for disability insurance benefits under Title II of the Social Security Act is REVERSED and this case is REMANDED to the Social Security Administration for proceedings consistent with this opinion.

Entered this 22nd day of June, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge